UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **KATHLEEN A. BRANDNER, et al.** | § § | **CLASS ACTION COMPLAINT** |
| **Versus** | § § | **NO.: 2:10-cv-03242** |
| **ABBOTT LABORATORIES, INC., et al.** | § § § § § | **JUDGE: "R"** **MAGISTRATE: (3)** |

**PLAINTIFF'S AMENDED MEMORANDUM IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION**

MAY IT PLEASE THE COURT:

Plaintiffs in the captioned and consolidated cause have previously file a Motion for Class Certification, with Supporting Memorandum and exhibits on July 6, 2011. (Rec. Doc. 85). The Court set the Motion for Class Certification for hearing on December 7, 2011, and a briefing schedule was entered ordering plaintiffs to supplement their memorandum in support of class certification by November 9, 2011. On July 13, 2011, the defendant filed a Motion to Deny Class Certification and Strike Class Allegations (Rec. Doc. 93). The Court heard oral argument on the defendant's motion on October 5, 2011. While the court has not yet ruled on the defendant's motion to deny class certification and to strike class allegations, it appears that the issue of class certification has been

narrowed to the question of whether or not a class should be certified on the plaintiffs' claim of redhibition. Plaintiffs rely on the previously filed motions and the arguments presented on the personal injury class claims, and the injunctive relief claims, and now file this memorandum to supplement the previous briefing and arguments on the issue of class certification as to the redhibition claim.

The defendant has argued that the claim for redhibition on a classwide basis must fail because they suggest that each and every class member would have to prove that his or her container of similac was defective. Proof of such a defect, the defendant argues, can only be accomplished by each and every class member proving that his or her similac actually contained beetles, or beetle parts of larvae. Plaintiffs argue that such stringent proof is not required and that the entire lot of recalled Similac product was defective, and that the evidence of that defect is the recall itself. In addition, plaintiffs argue that the defendant's designation of the similac product as "kosher" gives rise to another defect for purposes of redhibition because the contamination of the production line with beetles, beetle parts, and larvae rendered the entire lot of the recalled product contaminated and unworthy of the kosher designation. Plaintiffs believe that because of the contamination, the entire lot of recalled product is not kosher, and that those persons who utilized the product in reliance of the kosher designation may claim a redhibitory defect. In support, plaintiffs offer the affidavit of their expert, John James Farmer, III, Ph.D,[1] as well as the following arguments:

I.

LAW AND ARGUMENT

1.  Redhibition.

---

[1] See Exhibit A and exhibits attached thereto.

Redhibition is defined in the Louisiana Civil Code as:

> ... the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice.  LSA-C.C. Art. 2520.

In order to establish a *prima facie* case, a buyer must show that a non-apparent defect existed at the time of sale.  LSA-C.C. Art 2520 and 2530; *Jordan v. LeBlanc and Broussard Ford, Inc.*, 332 So.2d 534 (La.App. 3 Cir.1976).  The evidentiary burden is that the proof must be more probable than not. *Moreno's Inc. v. Lake Charles Catholic High Schools, Inc.*, 315 So.2d 660 (La.1975).  The buyer need not prove the underlying cause of the defect, but only that it existed.  *Gamble v. Bill Lowrey Chevrolet, Inc.*, 410 So.2d 1155 (La.App. 3 Cir.1981).  Once the plaintiff establishes his *prima facie* case, the burden shifts to the defendant to show that he can somehow escape liability. *Jordan v. Security Company*, 425 So.2d 333 (La.App. 3 Cir.1982).

The term "defect", as contemplated in Article 2520, means a physical imperfection or deformity; **or a lacking of necessary components or level of quality**. *Williams v. Louisiana Machinery Company, Inc.*, 387 So.2d 8 (La.App. 3 Cir.1980). (**emphasis added**). Proof that a redhibitory defect existed at the time of sale can be made by direct or circumstantial evidence giving rise to a reasonable inference that the defect existed at the time of sale. *Boos v. Benson Jeep-Eagle Co., Inc.*, 98-1424, p. 3 (La.App. 4 Cir. 6/24/98), 717 So.2d 661, 663.  In fact a rodent infestation of a house that went undiscovered for months has been determined to be a redhibitory defect of the house. *Royal v. Cook*, 984 So.2d 156 (La. App., 2008).

    A.    The product lacked the necessary level of quality.

The Recalled Similac Product was all manufactured in an area of the Sturgis manufacturing facility that had been compromised by an infestation of beetles. Some of the product in the lines was discovered to contain not only beetles, but also beetle larvae, and beetle and larval feces.[2] All of the Recalled Similac Product had a redhibitory defect not only because it had a physical imperfection, i.e. the presence of beetles, beetle parts and larvae in the manufacturing line, but because it lacked the level of quality promised by the defendant. Defendants admit that the product line used to manufacture all of the Recalled Similac Product should have been sterile and not contaminated with beetles, beetle larvae, and feces. Because it was not, all the product that passed through that line was recalled. The defendant admitted in its recall notice dated September 22, 2010 that it acknowledged that the product failed to meet its quality standards and that the product met the Food and Drug Administration's definition of adulterated, thus the entire lot of recalled product is defective by the defendant's own admission.[3]

The exposure of all of the Recalled Similac Product to beetles prior to canning, regardless of whether some of those beetles ended up in any particular canister, is a deviation from Abbott's normal manufacturing and quality control of Similac, and constitutes a redhibitory defect. Up until

---

[2] See, Farmer affidavit.

[3] *Id.*, referencing Abbott's recall notice, and Sec. 402 [21 USC §342] Adulterated Food which states in relevant part that "A food shall be deemed adulterated . . . (1) if it bears or contains any poisonous or deleterious substance which may render it injurious to health . . . or (3) if it consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food; or (4) if it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health. . . ."

the date it announced the recall, Abbott portrayed the Recalled Similac Product as safe, sterile, kosher, and of the same quality as non-recalled Similac product.

      B.      The product was defective because it was not kosher, even though designated as such.

The concept of "kosher" is explained in a 1993 Comment in the Boston College Environmental Affairs Law Review as follows:

> The general term for the Jewish dietary laws is *kasher* or *kashruth,* known in English as "kosher." The concept of kosher is not an easy one to define. The closest English words to describe "kosher" would be "fit" or "proper." The word *kashruth* only appears in the Scriptures three times and even then it is not related to food requirements. Nevertheless, the word "kosher" has been understood for hundreds of years to signify the system of Jewish dietary laws. Although the kosher dietary laws originally derived from biblical law, they have developed over time through rabbinical legislation and custom. Much of the material in the Talmud, a collection of the oral supplement to the Torah (the first five books of the Old Testament), focuses on these laws. The dietary laws most likely emerged from various prohibitions of antiquity or from health considerations. These laws outline the rules of permitted and forbidden animals; prohibited parts of otherwise permitted animals; the manner of slaughtering and preparing permitted animals; prohibited food mixtures; and proportions of food mixtures forbidden *ab initio* but permitted *ex postfacto*.[4]
>
> While persons adhering to kosher dietary laws are permitted to eat all vegetables, the rules prohibit the consumption of certain animals. The Bible establishes specific rules regarding the consumption of animals. It permits any animal that "parteth the hoof and is completely
>
> cloven footed and cheweth the cud." If either of these two traits is lacking, the animal is forbidden. This rule, for example, excludes the pig from permissible animals because it has cloven feet, but does not chew the cud. The dietary laws also prohibit many types of birds. Only certain birds that have customarily been eaten, such as chicken, ducks, geese, pigeons, and turkeys, are deemed "clean" and

---

[4]See Exhibit "B" attached; Catherine Beth Sullivan, *Are Kosher Food Laws Constitutionally Kosher?* , 21 B.C. Envtl. Aff. L. Rev. 201, at 203-04, (1993) (internal citations omitted), http://lawdigitalcommons.bc.edu/ealr/vol21/iss1/5

thus may be eaten. Fish must have both fins and scales; therefore, all shellfish are prohibited. ***"Swarming things," such as insects, are forbidden as well***.[5]

It is clear that the kosher designation requires adherence to many rules regarding cleanliness. In order to comply with the kosher rules, many things are prohibited, including "swarming things" like insects...such as beetles. The presence of beetles, beetle parts, and beetle larvae in the Similac product are clearly contrary to the Jewish dietary laws. As such, the presence of these non-kosher insects renders the product defective.

The defendant may argue that the kosher designation would apply only to Jewish consumers rather than to the proposed class of all consumers. This is not the case. The kosher designation is relied on by all faiths as well as members of the general public for non-religious reasons for the reasons that, among other things, the kosher designation signifies a product that is cleaner and healthier.

> Jews are not the only consumers of kosher food.[63] In fact, fewer than 25% of those who purchase kosher food are Jewish. Recent data indicate that 500,000 families in the United States eat kosher. This figure includes both observant Jews[66] who eat kosher in order to comply with their religion, and non-Jews. A growing number of non-Jewish consumers seek out kosher food for diverse reasons. These consumers include Seventh-Day Adventists[69] and Moslems who buy specific kosher foods to comply with their religious mandates. Persons with health problems such as allergies to milk products or shellfish also purchase kosher food. These people rely on the kosher seal which symbolizes that the kosher purveyor has followed the usual bases of kosher designation. Additionally, members of the general public purchase kosher products. These people include animal lovers who believe kosher slaughtering is more humane; vegetarians who buy kosher dairy products; and people who believe that kosher processes of food preparation are under closer scrutiny and are thus likely to be cleaner and healthier.[6]

---

[5] *Id.*, at 204 (***emphasis added.***)

[6] Id., at 206-207.

It seems

2.	The Recalled Similac Refund Program Was Not Adequate And Did Not Make Consumers Whole

The notice of the recall was inadequate to Louisiana consumers. There is no evidence that notice of the recall was published in any Louisiana newspapers, periodicals, or other printed publications. Likewise, there is no evidence that notice of the recall was carried by any other Louisiana based news media in any formats, e.g. television or internet media. In contrast, if this case were certified, even just for the economic redhibition claims, it is anticipated that court-approved notice plan will be enacted that will be specifically targeted to Louisiana consumers. Abbott's refund program was far from adequate because it did not make any customers whole.

Customers who returned containers smaller than 13 ounces and returned a total of less than $30 of product only received a retailer check that is only valid for the purchase of Similac products. Docket (Rec. Doc. 93-2 Ex E at ¶ 13). The amount of reimbursement was determined by a standardized price schedule. Docket (Rec. Doc. 93-2 Ex E at ¶ 15). Abbott only reimbursed customers for a maximum of three units of product if they did not return the product container along with their purchase receipts. (Rec. Doc. 93-2 Ex E at ¶ 17). Three units, assuming these are the larger sized units, is roughly only three weeks worth of product. Most infants take formula for 12 months or more. At best, a refund of the cost of three weeks worth of formula hardly makes the vast majority of consumers whole.

Abbott only reimbursed customers who could produce a receipt for their purchase. (Rec. Doc. 93-2 Ex E at ¶ 17). In an implicit acknowledgment that the Recalled Similac Products could cause physical injury to infants, Abbott offered up to two cases (12 containers) of additional product

to customers who no longer possessed the product container and who claimed their children experienced physical symptoms due to a recalled Similac product, as compensation to these families. (Rec. Doc. 93-2 Ex E at ¶ 18).  As of May 3, 2011, Abbot had only issued 140,590 refund checks nationwide, or approximately 3.5% of the recalled products.  (Rec. Doc. 93-2 Ex E at ¶ 20).

Abbott's refund program did not apprise any consumers of any legal consequences for their participation.  Abbott's refund program did not acknowledge that consumers had any legal rights in any pending class action litigations on file at the time the refund program was in effect.  Nor did Abbott apprise any consumers that they may be giving up any legal rights if they participated in its refund program.  Specifically, no consumers were ever advised that if they returned their Recalled Similac Product containers that they would be giving up any legal rights whatsoever, or that their product containers would not be retrievable or rendered incapable of being tested for contamination in the future as part of this already ongoing class action litigation.

## CONCLUSION

For all of the above and foregoing reasons, as well as those set forth in plaintiff's previously filed motion and memoranda to certify, the court should certify this matter as a class action.

Respectfully Submitted:

s/ David S. Scalia
DAVID S. SCALIA (LSBA #21369)
**SCALIA LAW FIRM**

8

855 Baronne Street

New Orleans, Louisiana 70113

Telephone: (504) 301-1867

Facsimile: (504) 561-6775

Email: dscalia@scalialaw.net

**PLYMALE LAW FIRM**

DOUGLAS R. PLYMALE (LSBA #28409)

One Canal Place

365 Canal Street, Suite 1000

New Orleans, LA 70130

Telephone:  (504) 648-0180

Facsimile:  (504) 648-0181

Email:  drplymale@plymalelawfirm.com

MICHAEL S. BRANDNER, JR (LSBA#27973)

**BRANDNER LAW FIRM, LLC**

3324 N. Causeway Blvd.

Metairie, Louisiana 70002

Telephone: (504) 552-5000

Facsimile: (504) 888-5456

Email: Michael@BrandnerLawFirm.com

        STEPHEN S. KRELLER (LSBA #28440)

        **THE KRELLER LAW FIRM**

        4224 Canal Street

        New Orleans, Louisiana 70119

        Telephone: (504) 484-3488

        Facsimile: (888) 294-6091

        Email: ssk@krellerlaw.com

        Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

      I hereby certify that a copy of the above and foregoing pleading has been served upon all counsel of record through the Court's CM/ECF system, or by placing same in the United States mail, properly addressed and with first class postage prepaid, or by hand delivery, or by facsimile, e-mail or other electronic means on this 9th day of November, 2011.

        s/ David S. Scalia

        DAVID S. SCALIA